**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA, and** | ) | **CIVIL ACTION NO. _____** |
| **the STATE OF TENNESSEE** *ex rel.* | ) | |
| **Dr. L. Darryl Quarles,** | ) | **JURY DEMAND** |
| | ) | |
| *Plaintiffs,* | ) | **FILED UNDER SEAL PURSUANT** |
| | ) | **TO 31 U.S.C. §3730** |
| **v.** | ) | |
| | ) | **DO NOT ENTER INTO PACER** |
| **SATELLITE HEALTHCARE, INC., UT** | ) | **DO NOT ENTER IN CM/ECF** |
| **MEDICAL GROUP, INC. WELLBOUND** | ) | **DO NOT PLACE IN PRESS BOX** |
| **OF MEMPHIS, LLC** | ) | |
| | ) | |
| *Defendants.* | ) | |

## RELATOR'S SEALED FALSE CLAIMS ACT COMPLAINT

### INTRODUCTION

1.      Relator L. Darryl Quarles, M.D. ("Relator" or "Dr. Quarles"), on behalf of the United States of America and the State of Tennessee, brings this action against Satellite Healthcare, Inc. ("Satellite"), UT Medical Group, Inc. ("UTMG"), and Wellbound of Memphis, LLC ("Wellbound") (collectively, ("Defendants") for violations of the federal False Claims Act, 31 U.S.C. §§3729 *et seq.* ("FCA"), and the Tennessee Medicaid False Claims Act, TENN. CODE ANN. §§71-5-181 *et seq.* ("TMFCA"), to recover all damages, civil penalties, and other recoveries provided for under those statutes.

2.      Defendants have defrauded and continue to defraud Medicare and Medicaid by providing and billing for renal dialysis services that are tainted by unlawful kickbacks, in violation of the federal Anti-Kickback Statute, 42 U.S.C. §1320-7b(b) ("AKS").

3.      Specifically, Satellite and UTMG have induced Memphis-area nephrologists (*i.e.* kidney doctors) to refer patients to its facilities by creating the Wellbound joint venture and allowing high-volume nephrologists—and only high-volume nephrologists—to buy in at well below fair-market rates.

4.      These below-market buy ins violate the federal AKS, as Satellite and UTMG have offered them to specific doctors in order to induce referrals from those doctors.

5.      The purpose of the AKS is to ensure that physicians make clinical decisions based upon impartial medical judgment—not their own financial self-interest.  Satellite and UTMG have undermined this basic principle, using their Wellbound joint venture to offer nephrologists kickbacks in exchange for their patient referrals.

6.      As a matter of law, any claims submitted by Satellite, UTMG, or Wellbound for dialysis services tainted by these illegal kickbacks are ineligible for reimbursement by the Medicare or Medicaid Programs.

7.      In violation of the law, Defendants have submitted, or caused others to submit, such kickback-tainted claims.  As a consequence, the United States and the State of Tennessee have been and continue to be damaged in a significant amount.

8.      Dr. Quarles, the Relator in this case, has direct first-hand knowledge of this scheme to defraud the United States and the State of Tennessee.  During the relevant time period, Dr. Quarles has been a nephrologist affiliated with UTMG and the University of Tennessee Health Sciences Center ("UTHSC").  He has interacted with representatives of Satellite, UTMG, and all three of the UTMG nephrologists—Dr. R. Bradley Canada ("Dr. Canada"), Dr. Arif Showkat ("Dr. Showkat"), and Dr. Omer M. Asif Siddiqui ("Dr. Siddiqui")—who bought into Wellbound in exchange for referring their patients there.

2

## JURISDICTION AND VENUE

9.      This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331, 1345, and 1372.

10.      Venue is proper in this district under 28 U.S.C. §§1391(b) and 1395(a), and 31 U.S.C. §3732(a), because the acts alleged in this Complaint occurred in the Western District of Tennessee.

11.      Venue is proper in this division of the Western District of Tennessee under Local Rule 3.3(b)(2) because the claim arose and the complained of events occurred in Shelby County, Tennessee.

12.      Relator is providing the United States with a full disclosure of substantially all material facts, as required by the FCA, 31 U.S.C. §3730(b)(2), and is providing the State of Tennessee with a full disclosure of substantially all material evidence and information, as required by the TMFCA, TENN. CODE ANN. §71-5-183(b)(2).

## PARTIES

13.      Relator, Dr. Quarles, is a citizen of the United States and a resident of Shelby County, Tennessee.  In 2010, Dr. Quarles, a nephrologist, was hired as a medical professor at UTHSC, in Memphis, Tennessee, where he is still employed. Relator has also been and continues to be affiliated with UTMG as a practicing nephrologist, although he focuses his attention primarily on research and academics and sees only a small number of patients.

14.      Defendant UTMG is a Tennessee non-profit corporation with a principal address of 1407 Union Avenue, Suite 700, Memphis, Tennessee 38104.  During the relevant period, UTMG has operated as a physician practice group whose membership is limited to physicians who serve on the faculty of the University of Tennessee College of Medicine.  Beginning in

about spring of 2012, UTMG has jointly owned and operated dialysis centers in Memphis, Tennessee together with Satellite and various individual nephrologists.  Since approximately spring of 2014, UTMG has done business under the name University Clinical Health ("UCH").

15.     Defendant Satellite is a California non-profit dialysis company headquartered at 300 Santana Row, Suite 300, San Jose, California 95128.  Satellite owns, either on its own or jointly, approximately 80 dialysis facilities, concentrated in California, but with additional clusters in Texas, Memphis, and the greater Chicago area. Beginning in about spring of 2012, Satellite has jointly owned and operated dialysis centers in Memphis, Tennessee, together with UTMG and various individual nephrologists.

16.     Defendant Wellbound is one of the dialysis joint ventures entered into by Satellite, UTMG, and the individual nephrologists.  Unlike earlier joint ventures between Satellite and UTMG—which offered an opportunity to buy in to all academic nephrologists affiliated with UTMG—the only nephrologists permitted to buy into Wellbound were those with large patient bases.  In further contrast to the earlier joint ventures, Satellite and UTMG permitted a non-academic nephrologist named John Morris III to buy in, based on his ability to refer a significant number of his own patients to the Wellbound dialysis clinic.

17.     The United States is a plaintiff to this action.  The United States brings this action on behalf of the Department of Health and Human Services ("HHS"), the Centers for Medicare and Medicaid Services ("CMS"), and other federally funded health care programs, including Medicare.

18.     The State of Tennessee is also a party to this action.  Tennessee, on behalf of the Bureau of TennCare and the director of Health Care Finance and Administration of the State of Tennessee, provides services to TennCare beneficiaries under contracts (titled Contractor Risk

Agreements) with various Managed Care Organizations ("MCOs"). These MCOs are essentially private insurance companies who have contracted with the State of Tennessee to coordinate and provide TennCare services. Defendants have fraudulently billed the State of Tennessee just as they have fraudulently billed the United States.

## APPLICABLE LAW

**I.     Medicare and Medicaid Payments for End Stage Renal Dialysis**

19.     Medicare is a federally-funded health insurance program primarily benefitting the elderly, but which also provides benefits to patients with End Stage Renal Disease ("ESRD") under Medicare Parts A and B. Individuals who are otherwise ineligible for Medicare become eligible when they develop ESRD. *See generally* MEDICARE BENEFIT POLICY MANUAL, ch. 11 – End Stage Renal Disease.

20.     Dialysis services furnished to hospital in-patients are covered under Medicare Part A and paid in accordance with the applicable Part A payment rules.

21.     Dialysis services furnished outside of the hospital setting (*i.e.* in free-standing dialysis clinics or in the patient's home) are covered under Medicare Part B, and compensated through a Prospective Payment System ("PPS"). *See* MEDICARE BENEFIT POLICY MANUAL, ch. 11 §50.

22.     For patients receiving at-home dialysis treatment, the managing facility is able to submit claims for payment not only for the dialysis itself, but also for certain activities related to training the patient and the patient's caregiver in performing home dialysis. *See* MEDICARE BENEFIT POLICY MANUAL, ch. 11 §60(c).

23.     Although patients with ESRD become eligible for Medicare coverage regardless of age, there is typically a delay in between the patient receiving a diagnosis of ESRD and Medicare coverage becoming effective.

24.     In Tennessee, TennCare will generally cover dialysis services for beneficiaries for up to 90 days after the patient's ESRD diagnosis—*i.e.* the period of time before the patient becomes eligible for Medicare coverage.  *See* TENNCARE RULES 1200-13-13.04, 1200-13-14.04.

## II.     The Federal Anti-Kickback Statute

25.     The federal AKS, 42 U.S.C. §§1320a-7b *et seq*., prohibits health care providers from paying physicians any form of compensation to induce, or reward, a physician to refer patients to the provider.  This act is designed to ensure the quality of patient care and deter abuse of federal health care programs, including Medicare and/or Medicaid, by proscribing certain conflicts of interest.

26.     Specifically, the AKS provides that anyone who knowingly and willfully solicits, receives, pays or offers to pay any remuneration (whether directly, indirectly, covertly or overtly) in exchange for the referral of items or services that a federal health care program, including Medicare and/or Medicaid, may pay in whole or in part shall be guilty of a felony.  42 U.S.C. §1320a-7b(b)(1)-(2).

27.     "Remuneration" encompasses the payment or provision of anything of value, including in-cash transfers or in-kind transfers such as providing office space, equipment, staff or other benefits to a physician for a cost other than fair market value.

28.     The AKS and its accompanying regulations also include specific exceptions, generally called safe harbors, which if applicable, remove certain contractual arrangements from the purview of the Act.

29.     The one potentially relevant safe harbor here addresses joint ventures/personal investment income and is set forth at 42 C.F.R. §1001.952(a).

30.     Under that safe harbor provision, certain joint venture arrangements between a healthcare provider and physicians do not give rise to liability under the AKS.

31.     However, in order to establish that the safe harbor applies, the provider and physicians must meet *all* of the following eight criteria:

(i) No more than 40 percent of the value of the investment interests of each class of investment interests may be held in the previous fiscal year or previous 12 month period by investors who are in a position to make or influence referrals to, furnish items or services to, or otherwise generate business for the entity. (For purposes of paragraph (a)(2)(i) of this section, equivalent classes of equity investments may be combined, and equivalent classes of debt instruments may be combined.)

(ii) The terms on which an investment interest is offered to a passive investor, if any, who is in a position to make or influence referrals to, furnish items or services to, or otherwise generate business for the entity must be no different from the terms offered to other passive investors.

(iii) The terms on which an investment interest is offered to an investor who is in a position to make or influence referrals to, furnish items or services to, or otherwise generate business for the entity must not be related to the previous or expected volume of referrals, items or services furnished, or the amount of business otherwise generated from that investor to the entity.

(iv) There is no requirement that a passive investor, if any, make referrals to, be in a position to make or influence referrals to, furnish items or services to, or otherwise generate business for the entity as a condition for remaining as an investor.

(v) The entity or any investor must not market or furnish the entity's items or services (or those of another entity as part of a cross referral agreement) to passive investors differently than to non-investors.

(vi) No more than 40 percent of the entity's gross revenue related to the furnishing of health care items and services in the previous fiscal year or previous 12–month period may come from referrals or business otherwise generated from investors.

(vii) The entity or any investor (or other individual or entity acting on behalf of the entity or any investor in the entity) must not loan funds to or guarantee a loan for an investor who is in a position to make or influence referrals to, furnish items or services to, or otherwise generate business for the entity if the investor uses any part of such loan to

obtain the investment interest.

(viii) The amount of payment to an investor in return for the investment interest must be directly proportional to the amount of the capital investment (including the fair market value of any pre-operational services rendered) of that investor.

42 C.F.R. §1001.952(a)(2).

### III.    The Federal False Claims Act

32.     The FCA provides, in part, that any entity that (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; or (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, is liable to the United States for damages and penalties.  31 U.S.C. §§3729(a)(1)(A)-(B).

33.     A Person acts "knowingly" under the FCA when he or she "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information."  *Id*. at §3729(b)(1)(A).   No proof of specific intent to defraud is required by the FCA.   *Id*. at §3729(b)(1)(B).

34.     FCA violations may result in civil penalties of between $5,500 and $11,000 per false claim—subject to any applicable adjustment in the range of penalties mandated by the Federal Civil Penalties Inflation Adjustment Act of 1990 and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015—plus three times the amount of damages sustained by the Government as a result of the Defendants' illegal conduct.  31 U.S.C. §3729(a).

## FACTS

### I.      General Background on Defendants' Fraudulent Schemes

####    A.      UTMG Tasks Dr. Quarles with Establishing a Dialysis Joint Venture

35.      In 2010, UTHSC, in Memphis, Tennessee, hired Relator to serve as a medical professor.  As part of Relator's job, the dean of the medical school—initially Dr. Steven Schwab, followed by Dr. James Lacey Smith—tasked him with developing a new ownership model for dialysis clinics that would benefit academic nephrologists at the school.  The goal of this project was to establish supplemental sources of income for these nephrologists, to help compensate for the fact that academic nephrologists are usually paid much less than nephrologists in private practice.

36.      Specifically, Relator was given a mandate to establish a joint ownership and management plan between (1) an existing dialysis company; (2) UTMG; and (3) individual academic nephrologists at UTHSC.

37.      By February of 2010, Relator had fulfilled this task and had established two different, but related, dialysis joint ventures, both of them in partnership with Renal Advantage, Inc. ("RAI").

38.      The first joint venture was created to own and operate a dialysis clinic at 1333 Poplar Avenue, Memphis, Tennessee.  This venture was 60% owned by RAI, through its subsidiary RAI II, LLC, and 40% owned by UTMG Nephrology, LLC a subsidiary of UTMG.

39.      The second joint venture was created to own and operate a dialysis clinic at 4185 Pace Road, Memphis, Tennessee.  This venture was also 60% owned by RAI, through its subsidiary RAI II, LLC, and 40% owned by UTMG Nephrology, LLC, a subsidiary of UTMG.

40.     Every nephrologist on UTHSC faculty had the opportunity to buy into this venture by purchasing shares of UTMG Nephrology, LLC, and four out of six faculty nephrologists chose to do so—Relator, Dr. Canada, Dr. Christie Green ("Dr. Green"), and Dr. Showkat.  Each of these four nephrologists paid $32,000, and in return received a 10% share in the LLC.  UTMG owned the remaining 60%.

41.     Importantly, the joint venture was structured so that any nephrologist on the UTHSC faculty could buy in, any nephrologist who left UTHSC had to sell back their shares, and nephrologists who were not on the UTHSC faculty were prohibited from buying in.

42.     Additionally, Dr. Quarles made sure when he helped set up the joint venture that nothing in its ownership structure would reward individual nephrologists for referring patients to either of the two dialysis clinics.  Of the four nephrologists who chose to buy in, Dr. Quarles was more focused on research and academics and did not have a large base of patients to refer.  In contrast, Dr. Canada, Dr. Showkat, and Dr. Green all saw significant numbers of patients with ESRD. Dr. Quarles, Dr. Canada, Dr. Showkat, and Dr. Green all bought into the joint ventures according to the same terms and received dividend payments based purely on their ownership interests.

43.     At some point in or around 2011, Dr. Green left UTHSC, which in turn obligated her to sell her shares back to UTMG Nephrology, LLC.  From that point forward, UTMG Nephrology, LLC was 10% owned by Dr. Quarles, 10% owned by Dr. Canada, 10% owned by Dr. Showkat, and 70% owned by UTMG.

**B.** **Satellite Takes Over from RAI in the Joint Ventures.**

44.     This joint venture between RAI, UTMG, and the individual academic nephrologists continued from 2010 until 2012.

45.     At that point, RAI's corporate parent, Liberty Dialysis Holdings, Inc., was purchased by Fresenius Medical Care ("Fresenius").   To satisfy its anti-trust obligations, Fresenius divested certain Memphis dialysis centers, including the two clinics that RAI had previously maintained with UTMG Nephrology, LLC.

46.     Rather than just wind these joint ventures down, UTMG tasked Dr. Quarles with finding a new partner for the two clinics.

47.     The partner that Dr. Quarles and UTMG ultimately selected was Satellite, a California non-profit dialysis company that at that time had no presence in the Memphis area (or anywhere in Tennessee).

48.     Accordingly, UTMG, Satellite, and the individual nephrologists created two new limited liability companies for the existing dialysis centers—Satellite Dialysis of Pace Road, LLC, ("Pace"), and Satellite Dialysis of Poplar Avenue, LLC, ("Poplar")—and continued under the same ownership and management arrangement as had existed under the RAI joint venture, with Satellite taking RAI's place.

**C.** **Expansion Plans for the Joint Venture; Reorganization of UTMG.**

49.     During the negotiations between UTMG and Satellite, Satellite made clear that it wanted to expand its Memphis-area footprint beyond the Poplar Avenue and Pace Road locations.  UTMG Nephrology, LLC was also looking to expand during this period, which was part of the reason why it considered Satellite to be a good fit as a new joint venture partner.

50.     During 2012 and 2013, Dr. Quarles worked with Satellite—specifically with a Satellite representative named Steve Simpson—to develop proposals for potential joint expansion.

51.     One of those proposals called for the development of a new, jointly-owned facility dedicated entirely to at-home dialysis patients, under an existing Satellite program known as Wellbound.

52.     Up to that point, neither of the two dialysis facilities within the joint venture had been particularly focused on at-home dialysis treatment.  The Pace Road clinic did not have any at-home dialysis patients, and the Poplar Avenue clinic had less than half of its patient census receiving their dialysis treatments at home.

53.     Despite these low numbers, at-home dialysis patients were the most profitable patients that the Poplar clinic saw.  Medicare reimbursed the clinics at higher rates for overseeing and managing at-home dialysis than it did for providing in-center treatments, and also allowed clinics to bill for certain ancillary services relating to training patients and caregivers on how to administer the dialysis treatments at home.

54.     Accordingly, Satellite had a strong interest in maximizing the income it could draw from these at-home patients, which was a central feature of the Wellbound program.

55.     Under the proposal that Dr. Quarles and Steve Simpson developed, Wellbound would be jointly owned by UTMG and Satellite, in much the same way as the Poplar and Pace clinics were. Wellbound would then buy and incorporate the existing home-dialysis program from the Poplar Avenue clinic, to avoid any needless duplication of home dialysis services.

56.     As with the existing joint venture, the Wellbound proposal contemplated academic nephrologists associated with UTMG and UTHSC having the opportunity to buy into

this facility through a UTMG limited liability company, without regard for the individual nephrologist's patient base.

57.     Plans for this Wellbound venture proceeded far enough that a new limited liability company, called Wellbound of Memphis, LLC, was formed on or about August 22, 2013 and a site was selected for the clinic, at 780 Truse Parkway.

58.     However, during this same period, in late 2013 and into 2014, UTMG underwent a significant reorganization.  By the spring of 2014, a new CEO, named Drew Botschner, had taken over and reorganized the practice group.

59.     As part of this reorganization, CEO Botschner moved Dr. Quarles out of his leadership position in UTMG Nephrology, LLC, and also fired UTMG Nephrology, LLC's administrative director, a woman named Anjali M. Jones.

60.     Since that time, Dr. Quarles has had little direct involvement with the UTMG practice group, the joint venture, or with Satellite, though he has continued to interact on a regular basis with other UTMG nephrologists.

61.     Specifically, beginning in about March or April of 2014, Dr. Quarles ceased having any involvement with plans to set up the Wellbound joint venture.  In fact, CEO Botschner went out of his way to cut Relator out of any communications or planning regarding that proposed program.

>     **D.     Dr. Quarles Learns that Satellite and UTMG Have Reorganized the Wellbound Plan and Cut Him out of It.**

62.     About two years later, in April of 2016, Dr. Quarles learned for the first time that Satellite and UTMG had gone ahead and established the Wellbound joint venture.

63.     Neither Satellite nor UTMG ever actually informed him that the joint venture had been finalized.  Instead, as part of his role as a senior faculty member at the UTHSC, Dr. Quarles

learned of the new Wellbound venture through his yearly faculty evaluations of Dr. Canada, Dr. Showkat, and Dr. Siddiqui.

64.     Dr. Canada and Dr. Showkat were also owners of the Poplar and Pace joint ventures.  Dr. Siddiqui, in contrast, had never bought in to that prior joint venture.

65.     During these evaluations, Dr. Quarles learned that all three nephrologists had recently purchased interests in the new Wellbound dialysis clinic operated by Satellite, and that those doctors had started to transfer their in-home dialysis patients out from the 1333 Poplar Avenue clinic to the new Wellbound clinic sometime in or around December of 2015.

66.     Dr. Quarles also learned that Satellite and UTMG had only offered the opportunity to buy in to certain UTHSC nephrologists, while specifically excluding others.

67.     Dr. Quarles was one of the nephrologists who had been excluded, based on the fact that he was more of an academic than a clinician and did not have a large volume of patients to refer.

68.     After these evaluations, Dr. Quarles asked around and learned that Satellite and UTMG had also excluded Dr. Csaba Kovesdy, another academically-focused nephrologist at UTHSC.

69.     Dr. Quarles also learned that UTMG and Satellite had brought an outside nephrologist named Dr. John Morris III into the joint venture, based on the volume of patients he was able to refer—despite the fact that Dr. Morris was not on the faculty at UTHSC and had no prior affiliation with UTHSC or UTMG.

70.     Based on this information, Dr. Quarles became very concerned that this new joint venture violated the federal AKS and also violated the spirit and purpose of the original joint

14

venture model he had worked to establish—*i.e.* to create a modest, supplemental income stream for academic nephrologists, regardless of their ability to refer patients.

71.     In May of 2016, Dr. Quarles raised these concerns directly to practice group CEO Botschner, to the dean of the UTHSC medical school, and to Satellite regional representative Steve Simpson.  Dr. Quarles asked all three men why Satellite was being allowed to create a new joint venture that included only high-referring nephrologists and that appeared to be in direct competition with Satellite's Poplar Avenue joint-venture—which had never been disbanded or purchased by Wellbound.

72.     Dr. Quarles also asked why Satellite and UTMG believed that it was acceptable for the faculty physicians in the new joint venture—Dr. Canada, Dr. Showkat, and Dr. Siddiqui—to simply remove all of their home dialysis patients from the Poplar Avenue clinic and place them in the Wellbound Clinic without buying out the home dialysis unit at the Poplar Avenue Clinic.

73.     To date, Dr. Quarles has received no answers to any of these questions, other than vague assurances from Satellite and UTMG that they have been looking into his concerns.

## II.    The Wellbound Joint Venture Constitutes an Illegal Kickback Scheme

74.     As compared to the Pace Road and Poplar Avenue joint ventures that preceded them—which were designed to provide income to academic nephrologists regardless of their ability to refer patients for dialysis—the Wellbound joint venture was designed for the exact opposite purpose.

75.     Satellite and UTMG set up the Wellbound clinic to capture the patient base of high-volume nephrologists, to exclude lower-volume academically focused nephrologists, and to financially reward those high-volume nephrologists in order to induce referrals.

76.     These high-volume nephrologists were allowed to buy into the Wellbound clinic at well below market rates, and were also allowed to exploit an existing joint venture by cannibalizing the patient base from the Poplar Avenue clinic without paying any value in exchange.

77.     As a result, and for the reasons set forth in greater detail below, the Wellbound Clinic was and remains a clear pay-for-referral scheme, in violation of the federal AKS.  All claims for payment that Wellbound has submitted to Medicare and Medicaid for dialysis treatments arising from these improper kickbacks are therefore false and fraudulent under the federal FCA and TMFCA.

**A.      Satellite Allowed a High-Volume Non-Affiliated Nephrologist to Buy into the Joint Venture and to Purchase on More Favorable Terms than Academic Nephrologists.**

78.     During the annual evaluations that Dr. Quarles performed of Dr. Canada, Dr. Showkat, and Dr. Siddiqui in April of 2016, Dr. Quarles learned that Satellite and UTMG had made overtures to a Memphis-area nephrologist named John Morris III and invited him to buy into the Wellbound of Memphis joint venture—even though Dr. Morris had no affiliation with UTMG or UTHSC.

79.     Dr. Morris was an attractive partner for the joint venture, as he was one of the most successful Memphis-area nephrologists who was not already affiliated with any broader physician group.  That meant that he was "in play" to negotiate directly with a dialysis provider such as Satellite about where to refer his at-home dialysis patients.

80.     In fact, as far back as 2013, when Dr. Quarles was still involved in the leadership of UTMG Nephrology, LLC, Satellite had expressed an interest in entering into some kind of partnership with Dr. Morris.

81.     When this issue came up, Dr. Quarles emphasized to Satellite's representatives—most notably Steve Simpson—that ownership in the joint venture was only supposed to be open to individual nephrologists who were members of the UTHSC faculty.  He raised the possibility of Dr. Morris joining the faculty, but Satellite did not seem interested in that option, and discussions regarding Dr. Morris never advanced very far during that period.

82.     However, after CEO Botschner took over day-to-day control of UTMG Nephrology, LLC and forced Dr. Quarles out of his leadership role, Satellite and UTMG began reaching out to Dr. Morris again, as they continued to view him as one of the most valuable potential referral sources for dialysis patients in Memphis.

83.     Available Medicare data bears out this view.  For example, in fiscal year 2014—the most recent year for which such data is available—Dr. Morris provided nephrology services to 561 distinct Medicare beneficiaries.  During that same year, Dr. Canada provided services to 291 Medicare beneficiaries, Dr. Showkat provided services to 359 Medicare beneficiaries, and Dr. Siddiqui provided services to 380 Medicare beneficiaries.

84.     The total payments Dr. Morris received from Medicare during fiscal year 2014 were also higher than UTMG's own nephrologists.  The total medicare payment amount to Dr. Morris in 2014 was $307,354.15.  During that same year, the total medicare payment amount to Dr. Canada was $158,385.68, the payment to Dr. Showkat was $215,958.51, and the payment to Dr. Siddiqui was $167,994.20.

85.     Because of the high volume of patients Dr. Morris had available to refer, Satellite and UTMG not only permitted him to buy into the Wellbound joint venture, they allowed him to buy in on more favorable terms than any of the other nephrologists.

17

86.     Specifically, Dr. Morris was permitted to buy a 10% stake in the joint venture, while the other three nephrologists were limited to a 6% share each.

87.     During a conversation that Dr. Quarles had with Dr. Siddiqui in or about June 2016 regarding the Wellbound joint venture, Dr. Siddiqui expressed his frustration to Dr. Quarles about only being allowed to buy 6% when Dr. Morris was buying in at 10%.

88.     Additionally, Dr. Morris was permitted to buy in directly to the Wellbound joint venture, while Dr. Canada, Dr. Showkat, and Dr. Siddiqui all bought in indirectly—through a separate limited liability company that they jointly owned with UTMG. In fact, based on the records of the Tennessee Secretary of State, Wellbound of Memphis LLC changed from a two-member to a three-member LLC on March 31, 2015, which substantiates what the other nephrologists were telling Dr. Quarles about Dr. Morris buying in directly as the third member.

89.     In addition to these favorable buy-in terms, Dr. Quarles has learned from conversations with other UTMG nephrologists that Satellite and UTMG also offered Dr. Morris several meaningful perks in order to induce him to enter into their joint venture relationship.

90.     For one, Satellite allowed Dr. Morris to sublease space from the Wellbound clinic's facility at 780 Truse Parkway, from which to operate his own nephrology practice.

91.     Satellite has also offered Dr. Morris a position as medical director for one of Satellite's other newly-opened or soon to open dialysis clinics.

92.     In short, and in direct contrast to the Poplar Avenue and Pace Road joint venture, Satellite offered ownership interest in Wellbound to a high-volume, non-academic nephrologist—and in fact offered him more favorable terms—based on his ability to refer a large volume of patients to the new dialysis clinic.

18

**B.** **Satellite and UTMG Specifically Excluded Academically Focused UTHSC Nephrologists from Buying into the Wellbound Venture.**

93.     At the same time that Satellite and UTMG opened up the Wellbound joint venture to an outside, non-academic nephrologist based on his ability to refer patients, UTMG and Wellbound also went out of their way to exclude UTMG academic nephrologists who had been eligible to buy into the prior joint venture with Satellite.

94.     The best example of this exclusion is Dr. Quarles himself.  Even though Dr. Quarles was the doctor most responsible for setting up the joint venture model in the first place, and also responsible for bringing in Satellite as a new joint venture partner after Fresenius divested the Poplar and Pace clinics, UTMG and Satellite finalized the Wellbound program behind his back.  They did not offer him an opportunity to buy in and never even told him that the joint venture had been finalized and had begun operation.

95.     This choice to exclude Dr. Quarles—while permitting UTMG nephrologists Dr. Canada, Dr. Showkat, and Dr. Siddiqui to buy in—was not a coincidence.  Because Dr. Quarles was focused more on academic research, he did not see nearly as many patients as other UTHSC/UTMG nephrologists.  From Satellite's perspective, that meant that he was not nearly as valuable as a potential source of referrals.

96.     For example, in fiscal year 2014, Dr. Quarles only provided treatment to 32 Medicare beneficiaries—compared to 291 for Dr. Canada, 359 for Dr. Showkat, and 380 for Dr. Siddiqui during the same period.

97.     UTMG and Satellite also went out of their way to prevent Dr. Csaba Kovesdy, another UTHSC/UTMG nephrologist with an academic focus, from buying into the Wellbound joint venture.  Dr. Kovesdy learned about his exclusion at some point in the spring of 2016 and emailed Dr. Canada, on May 11, 2016, to ask why he had been excluded from participation.

98.     Notably, Dr. Canada responded to Dr. Kovesdy's email by acknowledging that Satellite had "decided to include non-academic physicians in their joint ventures along with hospital systems as it fits their strategy."

C.     **Satellite and UTMG Allowed the High Volume Nephrologists to Buy into the Wellbound Venture at Well Below Market Rates.**

99.     When Dr. Quarles and UTMG first established their dialysis joint venture with RAI in 2010, every nephrologist interested in participating had to pay $32,000 to buy a 10% share of UTMG Nephrology, LLC.  The four nephrologists who ended up buying in at that time became co-owners of UTMG Nephrology, LLC, together with UTMG, who owned the remaining 60% of the entity.  UTMG Nephrology, LLC, in turn purchased a 40% interest in the Poplar Avenue and the Pace Road dialysis clinics, with RAI owning the rest.

100.    Under this structure, the individual nephrologists who bought in in 2010 received the equivalent of 4% ownership in the two different dialysis clinics (*i.e.* they each owned 10% of an LLC that owned 40% of the two clinics).

101.    In contrast, Dr. Quarles learned from conversations with Dr. Canada and Dr. Siddiqui that the three UTMG physicians who bought into Wellbound each paid $12,000 for the equivalent of a 6% interest, some or all of which was purchased through a new UTMG limited liability company.

102.    This new LLC, in turn, bought somewhere between 36%-40% of the Wellbound joint venture, with Dr. Morris owning 10% and Satellite owning the remaining 50%-54%

103.    Notably, this ownership structure meant that individuals or entities with the ability to refer patients for dialysis collectively owned more than 40% of the interest in the Wellbound joint venture, which destroys the potential safe harbor for such ventures at 42 C.F.R. §1001.952(a)(2).

20

104.     Based on his experience organizing the original joint venture, Dr. Quarles is aware that the generally-accepted going rate for dialysis facilities in the Memphis area is approximately seven to eight times income before interest, taxes, depreciation, and amortization ("EBITDA").

105.     Dr. Quarles is also aware, based on the projected earnings statement that was provided to him in 2013 when he was still involved in planning the Wellbound project, that Satellite projected EBITDA for the Wellbound clinic in year one to be $67,560.

106.     Assuming a conservative valuation of seven times EBITDA (rather than eight), that means that the fair market value of the Wellbound Clinic should have been equal to about $472,920 (*i.e.* 7 x $67,560) at the time, based on Satellite's own numbers.

107.     That, in turn, means that a functional six percent share in the joint venture should have been worth approximately $28,375 (*i.e.* $472,920 x .06).

108.     As a result, Satellite and UTMG were clearly not asking nephrologists to pay fair market value when they allowed Dr. Canada, Dr. Showkat, and Dr. Siddiqui to buy into this joint venture at the functional equivalent of a 6% share for only $12,000—less than half of what that six percent interest was worth at fair market rates.

   **D.     Satellite and UTMG Permitted High Volume Nephrologists to Benefit from the Business and Patient Base that Had Been Built Up from a Prior Joint Venture Without Paying Anything for It.**

109.     An additional kickback that Satellite and UTMG provided to these high-volume nephrologists was a large patient base right out of the gate, which was provided at the expense of the Poplar joint venture, and which allowed Wellbound to become unusually profitable unusually fast.

21

110.    As far back as 2013, when Dr. Quarles was still involved in the early planning of the Wellbound joint venture, the plan had been for Wellbound to purchase and then subsume the in-home dialysis program at the Poplar dialysis clinic.

111.    After Dr. Quarles was pushed out of his management role at UTMG Nephrology, LLC, Satellite and UTMG changed their plan.  Rather than paying any value for the goodwill and the patient base that had been established at the Poplar Avenue clinic, Satellite and UTMG simply instructed Dr. Canada, Dr. Siddiqui, and Dr. Showkat to stop sending their in-home dialysis patients to that facility, and instead to start sending them to Wellbound.

112.    This switch allowed Wellbound to quickly establish a substantial patient base—a process that normally takes a new dialysis clinic several years.

113.    In May of 2016, Dr. Quarles exchanged emails related to Wellbound with Dr. Janannath Saikumar, another professor of nephrology at UTHSC.  Dr. Saikumar mentioned that he had been offered an opportunity to buy into Wellbound, but that he had ultimately declined. However, Dr. Saikumar was made the medical director of the Wellbound clinic and knew a great deal about its day to day operations.

114.    In the email exchange, Dr. Saikumar confirmed that "about 45" patients had already been transferred from other in-home dialysis centers, and he further expected that all in-home dialysis patients from Satellite facilities would be transferred into Wellbound by July of that year, resulting in the closure of the Poplar Avenue in-home dialysis program.

115.    Later, on or about June 30, 2016, Dr. Quarles had lunch with Dr. Vo, another nephrologist at UTHSC, who mentioned that as of that date, there were approximately 70 in-home dialysis patients already being seen at Wellbound.

116.    Given that Medicare reimburses more generously for in-home dialysis than it does for in-facility dialysis patients, this sweeping transfer of in-home dialysis patients from the old joint venture into Wellbound was effectively a subsidy to the owners of the new joint venture at the expense of the old.

117.    If nothing else, the fact that Wellbound had all-but-immediate access to a substantial patient base meant that the $12,000 that Dr. Canada, Dr. Showkat, and Dr. Siddiqui each paid to buy into the venture was even less reflective of fair market value than it would otherwise have been.

118.    The business model for Wellbound that Dr. Quarles saw back in June of 2013 had assumed an opening census of only 30 patients, and further assumed that by year five there would still be a total of just 60 patients.

119.    The fact that Wellbound's actual patient census was already at 70 less than six months after the facility opened meant that the year-one EBITDA projection of $67,560 in the initial Wellbound plan was grossly undervalued.

120.    Satellite and UTMG knew full well that the Wellbound venture was more valuable than they had stated, based in large part on their plan to quickly arrange the transfer of Satellite's in-home dialysis patients to Wellbound.

121.    Satellite and UTMG nonetheless allowed high-volume nephrologists to buy in at below market rates specifically to induce those nephrologists to refer all of their in-home dialysis patients to Wellbound.

122.    Accordingly, this entire joint venture was structured as a kickback scheme, consciously designed to capture the patient base of high-volume nephrologists through a thinly-veiled pay-for-referral model.

III.    **This Unlawful Kickback Scheme Has Resulted and Will Continue to Result in the Submission and of False Claims for Payment to the United States.**

123.    As previously noted, a diagnosis of ESRD typically qualifies an individual for Medicare coverage regardless of that individual's age.

124.    As a result, a disproportionately large number of dialysis patients are Medicare beneficiaries.

125.    This reality is reflected in both the financial statements of the Poplar and Pace joint ventures, and in the financial projections for Wellbound that Relator saw during the Summer of 2013.

126.    During the second quarter of fiscal year 2013, approximately 70% of the patients, and 87% of the revenue at the Pace Road dialysis clinic came from Medicare.

127.    During the same period at the Poplar Avenue clinic, Medicare patients made up 65% of the in-center patient census and a slightly higher percentage of home-dialysis patients.

128.    The financial estimates drawn up for Wellbound in 2013 similarly projected that the facility's patients would be 80% Medicare beneficiaries and 10% Medicaid beneficiaries.

129.    For all the reasons noted above, the Wellbound joint venture has violated and continues to violate the federal AKS, in that the entire venture is structured to make financial payments to nephrologists in order to induce patient referrals for dialysis.

130.    Every claim for payment submitted to Medicare or Medicaid by Wellbound or any related entity for dialysis treatments that were induced by these unlawful kickbacks is accordingly false under the federal FCA.

24

**IV.     Satellite's Scheme to Disguise Kickback Arrangements as Joint Ventures with Nephrologists Extends Beyond the Wellbound Joint Venture in Memphis.**

131.     During his time as a nephrologist in Memphis, Dr. Quarles has developed various contacts at Satellite, extending back to 2012 when Dr. Quarles worked with Satellite to bring it in to replace RAI as a joint venture partner.

132.     Based on his contacts with these representatives, and with nephrologists that Dr. Quarles knows from his personal life, Dr. Quarles is aware that Satellite's model of expansion through kickback arrangements masked as joint ventures is not limited to the Wellbound of Memphis joint venture, and appears to have become a basic part of Satellite's broader business model.

133.     For example, Relator is aware that Satellite permitted a physician group to purchase a 50% ownership interest in Wellbound of Evanston, LLC, a Wellbound joint venture in the Chicago area that opened at about the same time as the Wellbound facility in Memphis. Notably, under the federal regulations establishing a safe harbor from the AKS for certain types of investment/joint venture arrangements, the venture will presumptively not fall within the safe harbor if individuals or entities with the ability to make referrals own more than 40% of the interest. 42 C.F.R. §1001.952(a)(2).

134.     Dr. Quarles is also aware, at a more general level, that many Satellite employees, including some of those he spoke to and dealt with in his efforts to bring Satellite to Memphis in the first place, are no longer at the company and have voiced their displeasure that Satellite has changed its business model to focus far more single-mindedly on profit over patient care.

135.     Accordingly, it appears that the kickback scheme that Dr. Quarles has seen unfold first-hand at Wellbound Memphis is just one piece of a broader kickback plan by Satellite as it expands its dialysis business.

25

## CAUSES OF ACTION

## COUNT I

### Defendants' False Claims for Services Rendered as a Result of Illegal Physician Referrals Were in Violation of the Federal False Claims Act, 31 U.S.C. §3729(a)(1)(A)-(B)

136.    Relator re-alleges and incorporates the allegations above as if fully set forth herein.

137.    At all times relevant to this Complaint, Satellite, UTMG, and Wellbound knowingly presented, or caused to be presented, directly or indirectly, false and fraudulent claims for payment or approval to the United States through the Medicare and/or Medicaid programs, including claims for services rendered as a result of illegal physician referrals in violation of the federal AKS.

138.    Additionally, at all times relevant to this Complaint, Satellite, UTMG, and Wellbound knowingly made, used, or caused to be made or used, false records or statements material to these false or fraudulent claims to the United States.

139.    By virtue of the false or fraudulent claims presented, or caused to be presented, by the Defendants, and of the false or fraudulent records and statements made, used, and/or caused to be made and used by Defendants, the United States has suffered damages.

140.    Defendants are jointly and severally liable to the United States for treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented by Defendants—subject to any adjustment in the range of appropriate penalties mandated by the Federal Civil Penalties Inflation Adjustment Act of 1990 and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015.

## COUNT II

### Defendants' Retention and Concealment of Overpayments Made Under Medicare and/or Medicaid Violated the False Claims Act, 31 U.S.C. §3729(a)(1)(G)

141.    Relator re-alleges and incorporates by reference each allegation in each of the preceding paragraphs.

142.    As set forth above, Defendants knowingly concealed or knowingly improperly avoided an obligation to pay or transmit money to the United States by failing to repay amounts received from the Government for services that were not eligible for payment by Medicare and/or Medicaid under the applicable statutes, rules, and regulations.  Defendants knew they were not entitled to monies paid by Medicare and/or Medicaid for services performed as a result of illegal physician referrals, but concealed and avoided their obligation to repay such amounts.

143.    By virtue of Defendants' knowing concealment and avoidance of their obligations to pay money to the United States, the United States suffered damages.

144.    Defendants are jointly and severally liable to the United States for treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented by Defendants subject to any adjustment in the range of appropriate penalties mandated by the Federal Civil Penalties Inflation Adjustment Act of 1990 and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015.

## COUNT III
### Violation of the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §71-5-182(a)(1)(A) and (B)

145.    Relator realleges and incorporates by reference each allegation in each of the preceding paragraphs.

27

146.    At all times relevant to this Complaint, Defendants have knowingly presented or caused to be presented false and fraudulent claims for payment to the State of Tennessee through the TennCare program.

147.    Specifically, Defendants have knowingly submitted or caused to be submitted claims for renal dialysis that have been tainted by unlawful kickback payments.

148.    By virtue of these false and fraudulent claims that Defendants presented, the State of Tennessee has suffered actual damages.

149.    Defendants are jointly and severally liable to the State of Tennessee for treble damages, in an amount to be determined at trial, plus a civil penalty of $5,000 to $25,000 for each false claim presented or caused to be presented by Defendants.

## COUNT IV
### Defendant's Retention and Concealment of Overpayments Made Under Tenncare in Violation of the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §71-5-182(a)(1)(D)

150.    Relator realleges and incorporates by reference each allegation in each of the preceding paragraphs.

151.    Defendants have knowingly concealed and knowingly and improperly avoided their obligations to pay or transmit money to the State of Tennessee by failing to repay amounts received from the State of Tennessee for dialysis services that were tainted by unlawful kickbacks and accordingly ineligible for payment under the applicable TennCare Rules.

152.    By virtue of this knowing concealing and avoidance of their obligations to pay money back to the State of Tennessee, the State of Tennessee has suffered damages.

153.    Defendants are jointly and severally liable to the State of Tennessee for treble damages, in an amount to be determined at trial, plus a civil penalty of $5,000 to $25,000 for each false claim presented or caused to be presented by Defendants.

## <u>PRAYER FOR RELIEF</u>

Relator respectfully requests that this Court enter judgment against Defendants as follows:

A.    That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged within this Complaint, as the federal FCA provides at 31 U.S.C. §§3729 *et seq.*;

B.    That civil penalties of $11,000 be imposed for each and every false claim that Defendants presented to the United States, subject to any adjustment in the maximum allowable penalty mandated by the Federal Civil Penalties Inflation Adjustment Act of 1990 and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015;

C.    That the State of Tennessee be awarded damages in the amount of three times the damages sustained by the State of Tennessee because of the false claims and fraud alleged within this Complaint, as provided for in the TMFCA at Tenn. Code Ann. §71-5-182;

D.    That civil penalties of $25,000 be imposed for each and every false claim that Defendants presented to the State of Tennessee;

E.    That pre- and post-judgment interest be awarded;

F.    That the Court grant permanent injunctive relief to prevent any recurrence of violations of the FCA and/or TMFCA;

G.    That Relator be awarded the maximum percentage of any recovery allowed to him pursuant to the FCA and TMFCA;

H    That Relator be awarded all costs and expenses of this action, including statutory attorney fees, expenses and costs as permitted by the FCA and TMFCA;

I.    That this Court award such other and further relief as it deems just and proper.

## **DEMAND FOR JURY TRIAL**

Relator, on behalf of himself, the United States, and the State of Tennessee, demands a jury trial on all claims alleged.

DATED: September 12, 2016                    Respectfully Submitted:

/s/ Seth M. Hyatt
Jerry E. Martin (TBR # 20193)
Seth M. Hyatt (TBR # 31171)
**Barrett Johnston Martin
& Garrison, LLC**
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Tel. (615) 244-2202
Fax: (615) 252-3798
shyatt@barrettjohnston.com
jmartin@barrettjohnston.com


Janine D. Arno*
ROBBINS GELLER RUDMAN & DOWD, LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Tel: (561) 750-3000
Fax: (561) 750-3364
jarno@rgrdlaw.com

*Motion for admission *pro hac vice* forthcoming

*Attorneys for Plaintiff-Relator*